UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**EMILIO CABAN,**

        Plaintiff,

Case No.:

vs

**ATTORNEY GENERAL OF
THE STATE OF FLORIDA,**
Attorney General Ashley Moody in her
official capacity,

**STATE OF FLORIDA
OFFICE OF EXECUTIVE CLEMENCY,**
which consists of Governor Ron Desantis,
Attorney General Ashley Moody,
Commissioner of Agriculture Wilton Simpson,
Chief Financial Officer Jimmy Patronis, in
their respective official capacity;

and,

**ATTORNEY GENERAL UNITED STATES
OF AMERICA,** Attorney General Merrick Garland,
in his official capacity,

        Defendants.



FILED BY ___ D.C.
JUL 11 2023
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

    **COMES NOW,** the Plaintiff, EMILIO CABAN, pro se. and hereby brings this civil action for declaratory and injunctive relief, and alleges the following:

### INTRODUCTION

1.    This lawsuit challenges the constitutionality of the permanent or lifetime ban on firearms as it relates to felons by the State of Florida as written and as applied to the Plaintiff.

2. This lawsuit further challenges the constitutionality of the permanent or lifetime ban on firearms as it relates to felons by the United States of America as written and as applied to the Plaintiff.

3. This lawsuit further challenge's the constitutionality of the Clemency process and the Rules of Executive Clemency formulated under the authority of the Governor of the State of Florida by Article IV Section 8 of the Florida Constitution.

4. It is well established that the First Amendment of the United States Constitution protects the freedom of speech and the freedom of expression, in addition to the freedom of religion. The First Amendment also protects the right to petition the Government for a redress of grievances.

5. Further, it is well established that the Second Amendment of the United States Constitution protects the individual right of citizens to bear arms for self-defense.

6. It is also well established that the Fourteenth Amendment to the United States Constitution protects citizens from a State making or enforcing any law that shall abridge the privileges or immunities of the citizens of the United States as guaranteed by the Constitution of the United States, nor shall the State deny any person the equal protection of the laws.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Plaintiff's claims under 28 USC §1331 and §1343, and 42 USC §1983.

8. Plaintiff seeks remedies under 28 USC §2201 and 42 USC §1988.

9. Venue is proper pursuant to 28 USC §1391(b).

## HISTORY AND FACTS

10. The Plaintiff was convicted in the Seventeenth Judicial Circuit Court, In and For Broward County, Florida, as a Youthful Offender pursuant to Florida Statutes §958.04, of three (3) felonies stemming from one "episode" in October 1999.

11. The Plaintiff was convicted and sentenced as a Youthful Offender, pursuant to Florida Statute §958.04, to a term of incarceration of four (4) years Florida Department of Corrections, followed by two (2) years of supervision.

12. The Plaintiff was released from incarceration on September 1, 2001, and subsequently began his supervision.

13. On August 31, 2003, the Plaintiff's supervision terminated successfully.

14. Upon the Plaintiff's conviction in 1999, and his subsequent release from supervision in 2003, the prohibitions of 18 USC §922(g)(1) and Florida Statute §790.23 now applied to him.

15. Pursuant to Florida Law, the Florida Department of Corrections submitted the required documentation to afford the Plaintiff with the ability to request civil rights restoration under Florida Law.

16. On or about October, 2003, the Plaintiff submitted his Request for Waiver of the Rules and Request for Restoration of Civil Rights to the Office of Executive Clemency of the State of Florida.

17. On or about May, 2012, the Plaintiff's request for restoration of his civil rights was closed by the Florida Commission on Offender Review[1] due to a traffic citation pending for "Improper Use of a Transporter Tag", although the Rules of Executive Clemency did not provide for this action[2].

18. The letter issued by the Florida Commission on Offender Review explained to the Plaintiff that the reason for the closure of his request for restoration was due to the pendency of a "criminal charge" and that the Plaintiff can reapply when the charge is concluded, should the eligibility requirements be met.

19. On June 4, 2012, the Plaintiff was acquitted of the charge after a Non-Jury Trial.

20. Immediately following the acquittal, the Plaintiff submitted a request to re-open the original application for restoration of civil rights, and to be placed back in order of the "line" of pending applications.

21. With no response provided to the Plaintiff, the Plaintiff filed a second application[3] for Restoration of his Civil Rights on August 23, 2013.

---

[1] The Florida Commission on Offender Review is the "investigative office" of the Office of Executive Clemency, charged with investigating the eligibility of clemency and restoration of civil rights.
[2] At the time, the Rules of Executive Clemency only required an applicant to be without pending criminal charges at the time of application for restoration of civil rights with a hearing. For restoration of civil rights without a hearing, a pending criminal charge at any time was an invalidating factor.
[3] This request was done while the same Rules of Executive Clemency were in place as when the request was filed in 2003.

22. This application request was for Restoration of civil rights, restoration of the specific authority to own, possess or use firearms, or, a Full Pardon.

23. On or about January 2019, and further amended in 2020, Amendment 4 of the Florida Constitution came into effect, effectively establishing the right to vote to "felony offenders, except those convicted of murder or a felony sexual offense, upon completion of all terms of their sentence, including probation or parole."

24. At that time, by Constitutional Amendment, the Plaintiff regained his right to vote, as all terms of the sentence had been completed, including probation, supervision, or any fines or civil payments.

25. On March 10, 2021, the Clemency Board of Florida, which consists of the Governor, the Attorney General, the Chief Financial officer and the Commissioner of Agriculture, amended the Rules of Executive Clemency to "automatically upon processing and without hearing pursuant to Rule 9, or with a hearing pursuant to Rule 10, restores to the applicant all of the rights of citizenship in the State of Florida possessed by the person before his or her felony conviction – including the right to vote if not already restored by Amendment 4, the right to serve on a jury, and the right to hold public office – except the specific authority to own, possess, or use firearms.... A clemency application is required for the Restoration of Civil Rights."

26. Rule 9 of the Rules of Executive Clemency as amended in 2021 states:

**Rule 9 - Automatic Restoration of Civil Rights under Florida Law Without a Hearing for Felons Who Have Completed All Terms of Sentence Pursuant to Amendment 4 as Defined in § 98.0751(2)(a), Fla. Stat. (2020)**

**A. Criteria for Eligibility**

A person shall have his or her civil rights under Florida law immediately restored upon processing by automatic approval of the Clemency Board, including the right to vote, the right to serve on a jury, and the right to hold public office but excluding the specific authority to own, possess, or use firearms, without a hearing, if the following requirements are met:

1. The person has completed all terms of sentence under Amendment 4 as defined in § 98.0751(2)(a), Fla. Stat. (2020)—including any legal financial obligations—arising from his or her felony conviction or convictions;

2. The person has no outstanding detainers or pending criminal charges;

3. The person has paid all restitution pursuant to a court order or civil judgment and obligations pursuant to Chapter 960, Florida Statutes;

4. The person has never been convicted of one of the following crimes:
a. Murder as defined in § 98.0751(2)(c), Fla. Stat. (2020);
b. A felony sexual offense as defined in § 98.0751(2)(b), Fla. Stat. (2020);
c. Any offense committed in another jurisdiction or under Federal law which would constitute one of the foregoing offenses if committed within the criminal jurisdiction of Florida; and
5. The person must be a citizen of the United States; and if convicted in a court other than a Florida court, the person must be a legal resident of Florida.

27. Immediately, upon the amended rules having effect, the Plaintiff qualified for "automatic restoration" pursuant to the rules, as he met all the criteria.

28. Florida Statute 98.0751 states:

> **98.0751 Restoration of voting rights; termination of ineligibility subsequent to a felony conviction.—**
> (1) A person who has been disqualified from voting based on a felony conviction for an offense other than murder or a felony sexual offense must have such disqualification terminated and his or her voting rights restored pursuant to s. 4, Art. VI of the State Constitution upon the completion of all terms of his or her sentence, including parole or probation. The voting disqualification does not terminate unless a person's civil rights are restored pursuant to s. 8, Art. IV of the State Constitution if the disqualification arises from a felony conviction of murder or a felony sexual offense, or if the person has not completed all terms of sentence, as specified in subsection (2).
> (2) For purposes of this section, the term:
> (a) "Completion of all terms of sentence" means any portion of a sentence that is contained in the four corners of the sentencing document, including, but not limited to:
> 1. Release from any term of imprisonment ordered by the court as a part of the sentence;
> 2. Termination from any term of probation or community control ordered by the court as a part of the sentence;
> 3. Fulfillment of any term ordered by the court as a part of the sentence;

4. Termination from any term of any supervision, which is monitored by the Florida Commission on Offender Review, including, but not limited to, parole; and

5.a. Full payment of restitution ordered to a victim by the court as a part of the sentence. A victim includes, but is not limited to, a person or persons, the estate or estates thereof, an entity, the state, or the Federal Government.

b. Full payment of fines or fees ordered by the court as a part of the sentence or that are ordered by the court as a condition of any form of supervision, including, but not limited to, probation, community control, or parole.

c. The financial obligations required under sub-subparagraph a. or sub-subparagraph b. include only the amount specifically ordered by the court as part of the sentence and do not include any fines, fees, or costs that accrue after the date the obligation is ordered as a part of the sentence.

d. For the limited purpose of addressing a plea for relief pursuant to sub-subparagraph e. and notwithstanding any other statute, rule, or provision of law, a court may not be prohibited from modifying the financial obligations of an original sentence required under sub-subparagraph a. or sub-subparagraph b. Such modification shall not infringe on a defendant's or a victim's rights provided in the United States Constitution or the State Constitution.

e. Financial obligations required under sub-subparagraph a. or sub-subparagraph b. are considered completed in the following manner or in any combination thereof:

(I) Actual payment of the obligation in full.

(II) Upon the payee's approval, either through appearance in open court or through the production of a notarized consent by the payee, the termination by the court of any financial obligation to a payee, including, but not limited to, a victim, or the court.

(III) Completion of all community service hours, if the court, unless otherwise prohibited by law or the State Constitution, converts the financial obligation to community service.

A term required to be completed in accordance with this paragraph shall be deemed completed if the court modifies the original sentencing order to no longer require completion of such term. The requirement to pay any financial obligation specified in this paragraph is not deemed completed upon conversion to a civil lien.

(b) "Felony sexual offense" means any of the following:

1. Any felony offense that serves as a predicate to registration as a sexual offender in accordance with s. 943.0435;
2. Section 491.0112;
3. Section 784.049(3)(b);
4. Section 794.08;
5. Section 796.08;
6. Section 800.101;
7. Section 826.04;
8. Section 847.012;
9. Section 872.06(2);
10. Section 944.35(3)(b)2.;
11. Section 951.221(1); or
12. Any similar offense committed in another jurisdiction which would be an offense listed in this paragraph if it had been committed in violation of the laws of this state.

(c) "Murder" means either of the following:

1. A violation of any of the following sections which results in the actual killing of a human being:
   a. Section 775.33(4).
   b. Section 782.04(1), (2), or (3).
   c. Section 782.09.
2. Any similar offense committed in another jurisdiction which would be an offense listed in this paragraph if it had been committed in violation of the laws of this state.

(3)(a) The department shall obtain and review information pursuant to s. 98.075(5) related to a person who registers to vote and make an initial determination on whether such information is credible and reliable regarding whether the person is eligible pursuant to s. 4, Art. VI of the State Constitution and this section. Upon making an initial determination of the credibility and reliability of such information, the department shall forward such information to the supervisor of elections pursuant to s. 98.075.

(b) A local supervisor of elections shall verify and make a final determination pursuant to s. 98.075 regarding whether the person who registers to vote is eligible pursuant to s. 4, Art. VI of the State Constitution and this section.

> (c) The supervisor of elections may request additional assistance from the department in making the final determination, if necessary.
>
> (4) For the purpose of determining a voter registrant's eligibility, the provisions of this section shall be strictly construed. If a provision is susceptible to differing interpretations, it shall be construed in favor of the registrant.

29. The Plaintiff was not convicted of a felony sexual offense, or of murder as defined by Florida Statute 98.0751(2)(c), and therefore, had his voting rights restored by constitutional amendment.

30. In April, 2023, the Plaintiff received notification from the Clemency Board that his application for restoration of his civil rights, application for restoration of specific authority to possess a firearm, or a Full Pardon was denied, without reason or cause.

31. The denial letter specifically states that one cannot appeal a denial of clemency.

32. Lastly, the Plaintiff is at risk of prosecution, as the Plaintiff is married to a person who is not a convicted felon, and further, who exercises her Second Amendment rights. While she practices her Constitutionally protected right, she is burdened with having to keep any firearms under strict lock and key with the key in her possession, as well as her carry weapon in her possession at all times or locked up while home.

33. When the Plaintiff and his wife go places together, while she has her firearm in her possession, the Plaintiff is always at risk of arbitrary prosecution claiming "constructive" possession.

34. Therefore, the ban, as a whole and as applied to the Plaintiff, is a burden on not only the Plaintiff, but also his wife, on her everyday exercise of her rights.

## CLAIM I

## THE LIFETIME BAN, BY THE UNITED STATES OF AMERICA AND BY THE STATE OF FLORIDA, ON POSSESSION OR USE OF A FIREARM BY A CONVICTED FELON IS UNCONSTITUTIONAL AS WRITTEN AS IT IS NOT SUPPORTED BY HISTORICAL APPLICATIONS

35. The lifetime ban was originally enacted by the United States of America in the Federal Firearms Act of 1938, which was repealed and reinstituted by the Gun Control Act of 1968.

36. The lifetime ban on felons, as written, is not supported by historical views of the Founding Fathers of the United States, nor is it supported by any laws in history up to the date of its enactment in 1938.

37. At the time of our founding, the right to bear arms for self-defense was a priority.

38. One of the causes of the American Revolution against Britain (aside from attempting to make the colonies repay the crown for its defense of them during the French and Indian War) was due to the British attempt to ensure control and dominance over the colonies by disarming them.

39. The implementation of the Second Amendment outlines the belief of the Founding Fathers and the right of the people to have arms for self-defense, just as they have so valiantly fought to protect that belief in the American Revolution.

40. Another purpose for the Second Amendment was to cure and prohibit the types of arms restrictions that were implemented by the British government, which imposed restrictions on certain groups, especially the Catholics. Yet, although the Catholics had no right to bear arms by British law, they could possess or carry a firearm if they were granted a license. The Second Amendment was meant to abolish those restrictions.

41. Throughout history, there has never been a ban on firearms to citizens of the colonies, or of the individual states. The bans that have been implemented were on persons who were not citizens, or who could not be considered citizens, as an example: slaves, native Indians, and persons who would not swear loyalty to the colonies or individual states. Due to the fact that these groups were not citizens, they did not have the protections of the Constitution as written. In today's era, we utilize this type of ban on non-citizens as well, when it comes to other issues, not just firearms. A non-citizen who has not gone through the proper steps to have legal status has no right to counsel in immigration proceedings, do not have the right to vote in most elections, nor have the right to be free from searches and seizures within 100 mile radius of the United States border, with exceptions; all along side the prohibition on being in possession of a firearm.

42. While prohibitions and outright bans on firearms to citizens were not present, there were restrictions. After the Emancipation Proclamation was declared freeing all the slaves, some individual states still issued restrictions on "free blacks". This restriction was in the form of the requirement to have a license to have a firearm. The laws required

a "free black" to petition a justice of the peace and request a license to have a firearm, and if reasonable, the license would be issued for hunting and self-defense purposes.

43. There have been laws which disarmed an individual of weapons used in a possible crime, but did not prohibit the individual from purchasing new firearms. Even in Massachusetts in 1787, a law was passed that even persons guilty of treason and/or aiding and abetting Shays Rebellion, would be disarmed only for 3 years.

44. Throughout history, firearm regulation has been utilized through some restriction on citizens, rather than blanket prohibition. These restrictions applied to citizens that were deemed a threat to the government, or were racial in motivation. Yet, all the restrictions that were placed on these persons, were given a "way back", regardless of whether they were convicted of a crime, by either automatic "restoration" or by petitioning the justice of the peace.

45. The Second Amendment was never actually "restored" to persons, as it was never removed. The Second Amendment was just limited or restricted.

46. The "free-blacks" had the capability of petitioning a justice of the peace; and traitors had a 3-year waiting period. Aside from those restrictions, there were no others. Even persons who committed crime with weapons were solely disarmed of those specific weapons, and able to purchase or acquire others with no ramifications.

47. After the ratification of the 14th Amendment of the United States Constitution in 1868, the requirement of the "free blacks" needing to petition a justice of the peace was eliminated, as well as the law from 1787 in Massachusetts.

48. Therefore, there were no longer any blanket firearm prohibitions on firearms in regards to citizens of the United States.

49. A prohibition and a restriction are 2 different things. A prohibition, by definition is the action of forbidding something, especially by law or rule; whereas a restriction is a limiting condition or measure, especially a legal one.[4]

50. While a restriction is historically sound, a blanket prohibition is not.

51. Additionally, the Alcohol, Tobacco, Firearms and Explosives agency used to allow federal convicted felons the opportunity to petition for their specific authority to possess firearms. This measure was abolished in 1972, thereby leaving ALL federal

---

[4] Oxford Languages definitions

convicted felons permanently banned from exercising their Second Amendment rights, with no recourse in reestablishing that right.

52. Further, the State of Florida enacted its law regarding the illegality of possession of a firearm by a convicted felon in 1955. This law, Florida Statute §790.23 (ch.29766, 1955) as it was enacted in 1955 and as it stands today, is unconstitutional as it is a blanket prohibition and not a restriction.

53. Even with the Federal Firearms Act of 1938, the State of Florida did not criminalize the possession of a firearm by a felon until 17 years later, yet, was part of the United States since March 1845.

54. The Florida Constitution, as written in 1838, and the six revisions thereafter, all incorporate an Article guaranteeing the right to bear arms. In 1868, the right to bear arms was guaranteed by Article 1 Section 21.

55. As a matter of fact, the Constitution of Florida 1838 states ""Section 21. That the free white men of this State shall have the right to keep and bear arms, for their common defense."

56. Additionally, the same Constitution states in Article 1 Section 27 "That to guard against transgressions upon the rights of the people, we declare that every thing in this article is excepted out of the general powers of government, and shall forever remain inviolate; and that all laws contrary thereto, or to the following provisions, shall be void."

57. The Florida Constitution of 1868 states in Declaration of Rights Section 22 "Section 22. The people shall have the right to bear arms in defense of themselves and of the lawful authority of the State.." Section 24 states: "Section 24. This enunciation of rights shall not be construed to impair or deny others retained by the people."

58. At the time of founding of the United States, it is apparent that the right of persons to keep and bear arms was inviolate, by the United States and by the State of Florida.

59. With the Second Amendment to the United States Constitution being ratified in 1791, it was nearly 147 years that persons convicted of crimes were NOT permanently disarmed by the United States, and 164 years in the State of Florida. It was also 110 years since the State of Florida entered the Union of the United States.

60. There is nothing similar about any restrictions put in place in the Founding Era, simply because the restrictions were racially motivated; were made to prevent uprising against the government, in other words, to prevent violent treason; and, the Second Amendment was enacted to protect against prohibitions that were put into place prior to the founding of the United States.

61. Convicted felons, as a whole, do not fall into any of those categories, or can be viewed as being in a similar category, with the exception of persons convicted of treason, whereby they were restricted from possessing arms for only 3 years.

62. The Constitution of the State of Florida, as originally drafted before the Civil War and re-drafted after the Civil War show the intention and interpretation of the Constitution of the United States and of its own Constitution. The right to bear arms was not to be prohibited as a whole.

63. The Plaintiff herein in no way shape or form contests the ability of the States to utilize it's police powers as granted to them through the United States Constitution to issue restrictions on the Second Amendment as it feels necessary to protect its citizens and the State government. Yet a restriction is not a prohibition. There needs to be reasonable restrictive measures in place that allow for the automatic ability for a person to whom was restricted to no longer be restricted. Whether it be by being able to petition the Court of competent jurisdiction for a determination that he/she may possess firearms, or after a determinate amount of time, crime free, to show rehabilitation and successful re-entry into society.

64. Restrictions of time periods should be reasonable, or restrictions on the possession until a Court Order determining the disability no longer apply would be reasonable and are shown in history.

65. If a Court is to make the determination, certain safeguards should be put in place to ensure that the granting or denying of the petitions are not done arbitrarily. Petitions should be based on true grounds that show rehabilitation.

66. If the restriction is to be placed by time limitation, such time limitation should be reasonable, not to exceed at least half of the maximum penalty the offender could have received based on the highest offense, but to start upon release from custody or supervision. Therefore, if the maximum penalty for a crime is 30 years, but the offender

receives a 10 year sentence, once released, the offender must wait an additional 15 years from the date released, disqualifying conviction free, to automatically be allowed to possess a firearm.

67. The time restriction should not just stop there. The Plaintiff believes that there should be other safeguards in place. The Plaintiff believes that in addition to the time limitation, there needs to be a provision that would state that should a person get convicted of another disqualifying offense during the time period of the restriction, the second, or additional restriction is automatically added in addition to the first. Further, if there is a third disqualifying episode conviction, at that point, the offender forfeits the right to bear arms. As an example, the offender as stated above, who was sentenced to 10 years is released from incarceration, and 7 years later is convicted of another episode that has a maximum penalty of 5 years. The result of this would be the offender now has to complete the rest of his original 15 year waiting period, therefore, 8 years more from the date of his new release, and an additional 2.5 years, for a new total of 10.5 years from the date of new release. Additionally, if the same offender is convicted of a third disqualifying episode, the offender is now prohibited completely.

68. The above stated opinion would be reasonable and historically accurate as to what the founding fathers intended, while also permitting the States to protect their citizens.

69. Therefore, being that 18 USC 922(g)(1) and Florida Statute 790.23 both criminalize possession of a firearm by a convicted felon, these statutes are unconstitutional and not supported in history, as they are complete prohibitions, and not restrictions.

## CLAIM II
### THE LIFETIME BAN, BY THE UNITED STATES OF AMERICA AND BY THE STATE OF FLORIDA, ON POSSESSION OR USE OF A FIREARM BY A CONVICTED FELON IS UNCONSTITUTIONAL AS-APPLIED TO THE PLAINTIFF AND IS NOT SUPPORTED BY HISTORICAL APPLICATIONS

70. The Plaintiff herein re-states and incorporates paragraphs 35 through 69.

71. In addition to the argument set forth in Claim I and restated in paragraph 70, history has also shown based on action, that while rehabilitation was not a strict factor

throughout the colonies, there were some colonies that required it from "disaffected" persons.

72. At the time of the founding, "disaffected" persons were people who were disarmed due to their armed rebellion against the government or their lack of willingness to take an oath of loyalty, thereby becoming "enemies".

73. Many people who even committed firearms offenses were not disarmed at all, but instead had to pay a surety to ensure good behavior. Even so, there are examples from the colonial and founding periods of restricted persons having their right to keep and bear arms restored. Connecticut's 1775 law disarmed "inimical" persons only "until such time as he could prove his friendliness to the liberal cause." Massachusetts's 1776 law disarming disaffected persons provided that "persons who may have been heretofore disarmed by any of the committees of correspondence, inspection or safety" may "receive their arms again . . . by the order of such committee or the general court." Many disarmament acts provided exemptions for restricted persons who swore loyalty to the king. Even supporters of an armed uprising that were being disarmed in the Massachusetts Bay Colony, some who sought forgiveness from the Colony were welcomed back into the community and could once again possess arms. So, once the rehabilitation was shown, the arms restriction was removed. Just as with Shays Rebellion, which the disarmament was only for three years, as explained in Claim I.

74. Therefore, in history, disarmament was not meant to be permanent, as 18 USC 922(g)(1) and Florida Statute 790.23 are. The disarmament was meant to be temporary, until rehabilitation can be shown.

75. The Plaintiff was adjudicated a Youth Offender pursuant to Florida Statutes Chapter §958 in 1999.

76. Florida Statutes Chapter §958 was enacted for a specific purpose, just as the Federal Youthful Offender Act was pursuant to Chapter 401 and 403 of 18 USC §5001 through §5043.

77. The Federal Juvenile Delinquency Act in 18 USC §5039 specifically requires juveniles under the age of 21 to be housed in separate facility from "adult" offenders.

78. Florida Statutes Chapter §958 specifically requires youthful offenders also to be housed in facilities separate from "adult" offenders.

79. Yet, Florida Statute Chapter §958 states in F.S. §958.021 with specificity in relevant part: "**Legislative intent.**—The purpose of this chapter is to improve the chances of correction and successful return to the community of youthful offenders sentenced to imprisonment by providing them with enhanced vocational, educational, counseling, or public service opportunities and by preventing their association with older and more experienced criminals during the terms of their confinement."

80. Therefore, it is the intent of the Legislature of the State of Florida to "correct and successfully return to the community youthful offenders", which is, in shorter terminology, rehabilitating youthful offenders, which is the same as the Federal Youth Offender Act of 1950, and subsequently, the new version, the Federal Juvenile Delinquency Act, which also includes segregation from "adult" offenders, and, programs for rehabilitation.

81. The Youthful Offender Statute worked for the Plaintiff. He has been a law-abiding member of society for 20 years, since his release from custody, in addition to the 6 years since the date of the Plaintiff's offense and the time while incarcerated, for a total of 26 years.

82. During the Plaintiff's incarceration period as a youthful offender, in a facility that housed other youthful offenders, the Plaintiff received no disciplinary reports, nor had any physical altercations with other Youthful Offenders.

83. Additionally, the Plaintiff has raised 4 children, out of which, 1 is successfully retired from the United States Air Force, and 2 more are entering the United States Air Force, based on the encouragement and parenting by the Plaintiff.

84. In addition, the Plaintiff's immediate family, his sister, is a retired United States Air Force veteran, who was Security Forces (Military Police), as well as her husband (Plaintiff's brother-in-law).

85. The Plaintiff also surrounds himself with people who are law abiding, and are actually in law enforcement, and has assisted law enforcement in the prosecution of an offender.

86. The United States Supreme Court, as well as the Florida Supreme Court and the entire criminal justice system, understand that youthful offenders should be treated

differently than regular adult offenders, therefore, the ban by 18 USC §922(g)(1) and Florida Statute §790.23 should also be dealt with differently for youthful offenders.

87. When a youthful offender shows rehabilitation by leading a law-abiding life for a specified amount of time after the youthful offender determination, the Second Amendment should automatically be "restored", as history has shown with all persons "rehabilitated".

88. In accordance with history, the Plaintiff meets the criteria that would have applied in the founding era and it's disarmament restrictions, therefore, the Plaintiff would have had his Second Amendment Right automatically restored.

89. Based on history showing either no firearm restrictions after conviction of non-treason crimes, or, in some areas, showing firearm, restrictions being issued until such time as "rehabilitation" or "crime-free" life has been led for a specific amount of time, the prohibition on firearms as cited in 18 USC §922 (g)(1) and Florida Statue §790.23 are unconstitutional as-applied to the Plaintiff.

## CLAIM III

## THE CLEMENCY PROCESS AND THE RULES OF EXECUTIVE CLEMENCY FORMULATED UNDER THE AUTHORITY OF THE GOVERNOR OF THE STATE OF FLORIDA BY ARTICLE IV SECTION 8 OF THE FLORIDA CONSTITUTION ARE ARBITRARY AND UNCONSTITUTIONAL IN VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION AS-APPLIED TO THE PLAINTIFF.

90. The Plaintiff hereby re-asserts paragraphs 10 – 31 and incorporates them into this claim.

91. The First Amendment of the United States Constitution protects the right of all people to redress the government for their grievances.

92. The Clemency Process is not appealable, nor is it subject to judicial review, as the clemency process is a discretionary power vested to the Governor by the Article IV, Section §8(a) Florida State Constitution.

93. Florida Courts have declined to review by Petition for Writ of Mandamus, applications for clemency which have been denied. See **Bowles v. Desantis, 934 F.3d 1230, 1235-36 (11th Cir. 2019)**, "Florida law provides the executive branch with the

authority to commute punishments, and state law does not impose any legal limitations on officials' exercise of their discretion. **Fla. Const. art. IV, 8(a)**; **Fla. Stat. 940.01(1)**"; **Bryan v. DeSantis, 343 So. 3d 127 – (Fla: Dist. Court of Appeals, 1st Dist. 2022)**, " ..."[t]he clemency process in Florida derives solely from the Florida Constitution and [this Court has] recognized that the people of the State of Florida have vested 'sole, unrestricted, unlimited discretion exclusively in the executive in exercising this act of grace.'" **Carroll v. State, 114 So. 3d 883, 888 (Fla. 2013)** (quoting **Sullivan v. Askew, 348 So. 2d 312, 315 (Fla. 1977)**). As such, courts "will not generally second-guess the executive's determination that clemency is not warranted." **Pardo v. State, 108 So. 3d 558, 568 (Fla. 2012)**. Second, "no specific procedures are mandated in the clemency process." ***Johnston v. State,* 27 So. 3d 11, 25-26 (Fla. 2010)**."

94. Restoration of Civil Rights is a form of clemency that can only be granted by the Governor and the Office of Executive Clemency.

95. The Plaintiff is not a prisoner any longer, nor has he been for approximately 20 years.

96. In March, 2021, Governor Desantis and the Office of Executive Clemency amended the Rules of Executive Clemency as given the authority to do so per the Florida State Constitution.

97. In those rules, while stating that clemency is a discretionary act, the rules also state that under certain criteria, restoration is automatic.

98. Under this guise, automatic restoration is not discretionary, but mandatory.

99. The Governor and Office of Executive Clemency claim that if a person meets a certain criteria, his civil rights will be automatically restored, and when the application comes in front of the board, deny it based upon discretion.

100. This type of denial, especially without reasoning, is the exact definition of arbitrary.

101. Further, without having the right to appeal or have judicial review, the Governor and Office of Executive Clemency may disregard the rules that THEY put into place, as there are no checks and balances.

102. This is what occurred against the Plaintiff.

103. The Plaintiff filed for his Restoration of Civil Rights in 2003. That application was arbitrarily cancelled in 2012. The Plaintiff re-applied in 2013. In 2021, the Governor Desantis and the Office of Executive Clemency amended the rules to state that any person who has had his right to vote restored by Florida Constitutional Amendment 4, will have his right to sit on a jury, and his right to hold public office automatically restored upon processing of the application.

104. The requirements for voting restoration by Amendment 4 is a person not convicted of Murder or Felony Sexual Offense, and who has paid all fines and restitution, as well as completed all other forms of their sentence, will be reinstated.

105. The Plaintiff falls into that category.

106. The Governor and the Office of Executive Clemency restated those requirements for the automatic restoration of the remainder of the Plaintiff's civil rights.

107. The Plaintiff falls into that category also.

108. Therefore, pursuant to the Rules set forth by the Governor and the Office of Executive Clemency, the Plaintiff should have received a restoration of his civil rights.

109. Rather than restoring the rights of the Plaintiff as required by the Rules the Defendant put in place, they arbitrarily denied his application, with no reasoning.

110. They additionally stipulate that the Plaintiff can only reapply 2 years after the date of the denial.

111. With no judiciary available to consider or review the decision made by Defendant, the Plaintiff's First Amendment Right has been violated, as there is no way to cure or require the Defendant to proceed under it's own rules.

112. The Defendant always rests on that the Florida Constitution deems clemency is discretionary. Yet, the type of Clemency requested by the Plaintiff is different and distinguishable from the other cases they have defended regarding this matter.

113. The Plaintiff is not in-custody, therefore is not requesting a commutation of sentence or of fines. The Plaintiff also is not a death-row inmate. Additionally, while the Plaintiff did request a pardon, the request for Pardon was in addition to rights restoration and the specific authority to own and possess a firearm.

114. The Defendant could have simply granted the rights restoration and denied the pardon.

115.    The Defendant cannot "speak through both side of the mouth" by stating on one hand clemency is discretionary, and on the other, restoration of rights is automatic upon processing. The question lies, which one is it? It surely cannot be both.

116.    Therefore, the Defendant's process and rules are unconstitutional as being in violation of the First Amendment of the United States Constitution.

WHEREFORE, the Plaintiff humbly prays this Honorable Court enter a declaratory judgment finding, **1. 18 USC §922(g)(1) and F.S. §790.23** Unconstitutional as written; **2. 18 USC §922(g)(1) and F.S. §790.23** Unconstitutional As-Applied to the Plaintiff; and **3**. That the Rules of Executive Clemency and the Clemency Process are Unconstitutional As-Applied to the Plaintiff in violation of the First Amendment to the United States Constitution. The Plaintiff further requests this Honorable Court to enter Permanent Injunction Enjoining the Defendants from Enforcing **18 USC §922(g)(1)** and **F.S. §790.23** as written and/or as-applied, and further, requiring the Defendant Office of Executive Clemency to reinstate the previously denied application for restoration of civil rights, and enjoining Defendant from denying the application, or any other relief this Honorable Court deem fair and just.

RESPECTFULLY SUBMITTED,

Emilio Caban, pro se
410 SW 134th Way
Davie, FL 33325
561-859-1122
emiliocaban@gmail.com